**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FRANCIS BARRIENTOS, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 23-cv-6329 |
| v. | ) ) | Hon. Steven C. Seeger |
| FITNESS MEMBER SERVICES, LLC, d/b/a VASA FITNESS CORPORATE, | ) ) ) | |
| Defendant. | ) ) | |

**ORDER**

Francis Barrientos joined a gym and signed up online. A few months later, he tried to throw in the towel and cancel his membership. He talked to a manager at his neighborhood gym and said that he wanted out. Based on that conversation, he thought that he had cancelled the membership once and for all.

Barrientos quit the gym, but the gym didn't quit him. The gym kept charging him the monthly membership fee.

As it turns out, the membership contract required written notice at least one month in advance to cancel the membership. And Barrientos hadn't provided written notice – he simply spoke with the local manager, which didn't cut it. Barrientos tried to cancel the contract without following the contract's cancellation rules.

Barrientos was not pumped up about the continuing fees, so he sued the gym company, Fitness Member Services, LLC. The complaint has five claims, including a federal claim under the Electronic Funds Transfer Act as well as four claims under state law.

Defendant moved to dismiss.  For the reasons stated below, the motion to dismiss is granted in part and denied in part.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations.  *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020).  The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint."  *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

### *VASA Fitness*

Defendant Fitness Member Services, LLC ("VASA") does business as VASA Fitness Corporate, a gym and fitness center operator.  *See* Am. Cplt., at ¶ 2 (Dckt. No. 7).  VASA offers subscription memberships to customers to exercise at their gyms.  *Id.*

To sign up, customers visit VASA's website.  *Id.* at ¶ 17.  There, they select a membership plan.  *Id.*  VASA offers memberships on a recurring basis for monthly or yearly terms.  *Id.* at ¶ 16.  The memberships automatically renew at the end of the term unless and until a subscriber cancels the membership.  *Id.*

A basic membership costs $9.99 or $12.49 per month, but customers can pay more for higher tiers of membership.  *Id.* at ¶ 15.  Here, Barrientos agreed to pay $12.49 "each month."  *See* Membership Contract, "Promissory Note," at ¶ 2 (Dckt. No. 7-1, at 2 of 3).

Once a customer chooses a membership plan, the website sends the customer to other web pages on the VASA website.  And then, the website prompts the customer to create an account and provide payment information.  *See* Am. Cplt., at ¶ 18 (Dckt. No. 7).

On each page, the website displays a box on the right-hand side of the screen showing the following information:  (1) the selected plan, (2) the amount of money "due today," (3) the amount "due monthly," and (4) the amount of the "rate guarantee fee" and its corresponding "first due date."  *Id.*

Finally, the website sends customers to the "Checkout Page" to complete the payment and create the membership.  *Id.* at ¶ 19.  The checkout page contains the same box with the four pieces of information (meaning the selected plan, the amount "due today," and so on).  The checkout page also has a box reading "Friendly Reminder" at the top, with terms that the customer can scroll through.  *Id.*

A smaller box appears below that large text box, and a customer must check that box to "ACCEPT TERMS & APPLICATION FEES."  *Id.*  A red asterisk appears after the word "fees." *Id.*

The words "VIEW FULL CONTRACT" appear nearby, and that text is underlined and appears in red font.  *Id.*  With a simple click, those words become a hyperlink to the full membership contract.  *Id.* at ¶ 22.  Finally, at the bottom of the page is a button to "Place Order." *Id.* at ¶ 19.

Once a customer completes the signup process by placing the order, VASA generates a membership contract based on the information provided by the customer.  *Id* at ¶ 21.  The auto-generated contract includes an auto-generated version of the customer's signature and initials.  *Id.*  VASA does not ask for specific consent to add the customer's signature or initials to the contract.  *Id.*

The customer can access the membership contract by clicking on the "View Full Contract" link on the checkout page, but not before. *Id.* at ¶ 22. The website does not require customers to open the link to the full contract to complete the sign-up process. *Id.* at ¶ 24.

After signing up for a membership, customers receive a "Welcome Email" from VASA. *Id.* at ¶ 26. The Welcome Email includes the completed contract, which is attached as a pdf at the bottom of the email. *Id.* at ¶ 30. The Welcome Email does not call attention to the contract or explicitly tell the recipient that the contract is attached to the email. *Id.* at ¶ 29. In other words, the contract is there, but the email doesn't go out of its way to flag it.

The Welcome Email *does* include information that indicates that the contract would renew automatically every month. The email says "Ongoing Monthly Dues," and "Contract Term: Month to Month." *See* Welcome Email (Dckt. No. 7-2, at 2 of 4).

The membership contract at the end of the Welcome Email is only two pages long. *See* Membership Contract (Dckt. No. 7-1). The first page of the contract includes the member's personal information, the monthly membership fee, and a section called "Promissory Note." *Id.* The second page has a separate section called "Fees, Rules, and Regulations." *Id.*

The "promissory note" portion of the contract includes seven paragraphs. It discloses that payments will be processed and collected by Paramount Acceptance for and on behalf of VASA. *See* Am. Cplt., at ¶ 36 (Dckt. No. 7); *see also* Membership Contract, "Promissory Note," at ¶ 6 (Dckt. No. 7-1, at 2 of 3). Importantly, the contract expressly states that the payments would be made by electronic funds transfer, and would be treated as if personally signed by the customer. *See* Membership Contract, "Promissory Note," at ¶¶ 6–7.

The contract also informs the customer that "failure to regularly attend and utilize the facilities does not relieve me of my obligations regardless of the circumstances." *Id.* at ¶ 1. So,

4

if a member decides to stay on the couch and out of the gym, the member must continue to pay for the membership.

The contract restricts the member's ability to cancel. The first paragraph says that "except and herein provided, my membership is non-cancelable." *Id.* Worse yet, if the member defaults, then the member must pay all costs of collection. *Id.*

The contract includes a provision about automatic renewal. "Following the initial 1 (one) month membership term, my/our membership agreement will automatically renew on a month-to-month basis at the monthly rate of $12.49 until a written 1 (one) month cancellation notice is received by VASA Fitness at the address noted below." *Id.* at ¶ 2; *see also* Am. Cplt., at ¶ 37 (Dckt. No. 7).

Cancelling the contract requires the customer to jump through a few hoops. A customer must give one month advance notice, in writing, to cancel the contract. *See* Am. Cplt., at ¶ 41 (Dckt. No. 7). "This contact may be terminated only by giving 1 (one) month advance written notice to VASA. Monthly dues and other applicable fees must be current to terminate this contract." *See* Membership Contract, "Fees, Rules, and Regulations," at ¶ 17 (Dckt. No. 7-1, at 3 of 3) (entitled "Termination of Contracts"). Like a tar pit, it's easy to get in, and hard to get out.

For good measure, the contract reiterated that the customer could not cancel the agreement orally. "***This contract may not be cancelled over the phone***." *Id.* at ¶ 14 (emphasis in original).

VASA members have complained about VASA's billing practices online on websites like the Better Business Bureau. *See* Am. Cplt., at ¶ 47 (Dckt. No. 7). The complaint includes a few examples. *Id.* at ¶ 48.

5

*Plaintiff's Contract*

Plaintiff Francis Barrientos signed up for a VASA membership on October 7, 2021 on the VASA website.  *Id.* at ¶ 50.  Barrientos was unaware that he enrolled in an automatic renewal program when he entered into the contract.  *Id.* at ¶ 52.

Barrientos received the Welcome Email from VASA on the same day that he signed up for his membership.  *Id.* at ¶ 53.  Again, the Welcome Email itself did not call attention to the fact that VASA had generated a contract, but the contract was attached to the email.  *Id.* at ¶¶ 54–55.  Barrientos never saw the contract.  *Id.* at ¶ 55.

When Barrientos signed up for his membership, the gym in his preferred location in Villa Park, Illinois was still under construction.  *Id.* at ¶ 56.  The gym didn't open until December 19, 2021, over two months after he signed up for the membership.  *Id.* at ¶ 58.  Barrientos never used the gym at any time during his membership.  *Id.* at ¶ 57.

After the gym opened in December 2021, Barrientos called the gym and spoke to the manager of the Villa Park location.  *Id.* at ¶ 59.  Barrientos wanted to cancel his membership.  So he told the manager, who confirmed to Barrientos that his membership was cancelled and that he would no longer be billed.  *Id.* at ¶ 60.

But VASA continued to charge Barrientos his monthly membership fee.  *Id.* at ¶ 61.  In fact, Barrientos was charged eleven times after he spoke with the manager.  *Id.* at ¶ 64.  Barrientos didn't realize that he was still getting charged until October 2022, about 10 months later.  *Id.* at ¶ 65.

Barrientos contacted VASA to request that they stop charging his account, but it apparently fell on deaf ears.  *Id.* at ¶ 66.  VASA sent Barrientos to collections in March 2023.  *Id.* at ¶ 67.  In total, he was charged over $100.  *Id.* at ¶ 68.

Barrientos responded by filing suit. He alleges that VASA engaged in an "automatic renewal scheme" that violated state and federal law. *See* Cplt. (Dckt. No. 1). He filed suit on behalf of himself and a putative class.

Barrientos later filed an amended complaint, which includes five claims. *See* Am. Cplt. (Dckt. No. 7). The amended complaint includes one claim under federal law, and four claims under state law.

The first four claims arise under Illinois law. Count I alleges a violation of the Illinois Automatic Contract Renewal Act, 815 ILCS 601/1. *Id.* at ¶¶ 111–21. Count II asserts a common law claim for unjust enrichment in the alternative to the statutory claims. *Id.* at ¶¶ 122–27. Count III alleges a violation of the Illinois Physical Fitness Services Act, 815 ILCS 645/1. *Id.* at ¶¶ 128–42. And Count IV alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1. *Id.* at ¶¶ 143–55.

The fifth and final claim arises under federal law. Count V alleges a violation of the Electronic Funds Transfer Act ("EFTA"). *Id.* at ¶¶ 156–65.

VASA moved to dismiss the amended complaint in its entirety for failure to state a claim. *See* Mtn. to Dismiss (Dckt. No. 17).

Before diving into the merits, the Court takes a little jurisdictional detour. The complaint includes a claim under federal law, so this Court has federal question jurisdiction. As explained below, this Court concludes that the federal claim does not pass muster. So, the remaining state-law claims would need some other jurisdictional foothold to remain in federal court, meaning either supplemental jurisdiction (which is discretionary) or diversity jurisdiction.

This Court has diversity jurisdiction. Defendant is a limited liability company, which poses a jurisdictional wrinkle. Ordinarily, the citizenship of an unincorporated association such

as an LLC depends on the citizenship of each individual member.  *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 195–96 (1990); *Mut. Assignment & Indemnification Co. v. Lind-Waldock & Co.*, LLC, 364 F.3d 858, 861 (7th Cir. 2004).

But this case falls under the Class Action Fairness Act (in acronym-land, "CAFA").  And under that statute, Congress changed the rules.

In a CAFA case, an unincorporated association is a "citizen of the State where it has its principal place of business and the State under whose laws it is organized."  *See* 28 U.S.C. § 1332(d)(10).  And the term "unincorporated association" in the CAFA includes LLCs.  *See City of East St. Louis, Illinois v. Netflix, Inc.*, 83 F.4th 1066, 1071 (7th Cir. 2023); *see also Calchi v. TopCo Associates*, 676 F. Supp. 3d 604, 607 (N.D. Ill. 2023).

So, a limited liability company is treated like a *corporation* in a case under the Class Action Fairness Act, even though a limited liability company is treated like a *partnership* when it comes to diversity jurisdiction more generally.  The jurisdictional yardstick is different, depending on the type of case.  It might seem funny for a limited liability company to swap passports and have a different citizenship, depending on the nature of the case.  But Congress gets to set the rules.

Applying that standard, the case at hand checks all of the boxes for diversity jurisdiction.  There is diversity of citizenship.  Plaintiff is a citizen of Illinois.  Defendant is a citizen of Utah because it is organized under Utah law and maintains its principal place of business in Utah.

The complaint satisfies the other requirements under CAFA, too.  The amount in controversy exceeds $5 million in damages across a class of more than 100 members.

Jurisdiction is secure, even without a federal claim, so the Court turns to the merits.[1]

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

## Analysis

The Court will begin with the federal claim under the Electronic Funds Transfer Act ("EFTA"), and then will turn to the state-law claims.

## I. The Federal Claim (Count V)

Barrientos alleges that VASA violated the EFTA when it charged his bank account – and the bank accounts of other members – on a recurring basis. In his view, VASA failed to obtain preauthorization before taking the funds. *See* Am. Cplt., at ¶ 162 (Dckt. No. 7).

As the name reveals, the EFTA regulates the electronic transfer of funds between bank accounts. The Act provides that a "preauthorized electronic fund transfer from a consumer's

---

[1] The statute contains a minor carveout from CAFA jurisdiction for class actions in which the plaintiffs are predominantly citizens of one state. *See* 28 U.S.C. § 1332(d)(4). It also requires, however, that at least one defendant be a citizen of the state in which the case is filed, a condition not satisfied here.

account may be authorized by the consumer only in writing," and that "a copy of such authorization shall be provided to the consumer when made."  *See* 15 U.S.C. § 1693e(a).

The statutory text reveals two basic requirements before transferring funds from a consumer's account.  The consumer must (1) provide preauthorization for an electronic funds transfer, in writing, and (2) receive a copy of the authorization.[2]  A failure to comply gives rise to a claim.  *See* 15 U.S.C. § 1693m *et seq.*

Barrientos thinks that VASA violated the EFTA by charging his bank account for the recurring monthly membership fee without his written preauthorization.  *See* Am. Cplt., at ¶ 162 (Dckt. No. 7).  Barrientos also thinks that VASA violated the statute by charging his account after he "revoked consent" to the charges.  *Id.* at ¶ 163.  In his view, the revocation means that the gym no longer had preauthorization.

VASA offers a much different view.  *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 13 (Dckt. No. 18).  As the gym sees it, Barrientos signed up for a membership.  *See* Am. Cplt., at ¶ 50 (Dckt. No. 7).  As part of the signup process, he agreed to a contract.  *Id.* at ¶ 21.  That contract preauthorized VASA to charge Barrientos's account monthly for his membership fee. *Id.* at ¶ 52.  And Barrientos never cancelled the contract, so the authorization never went away.

---

[2]  The Federal Reserve Board underscored those requirements in a regulation to implement the statute. *See* 12 C.F.R. § 205.1(a); *see also* 15 U.S.C. § 1693b.  The regulation provides that "[p]reauthorized electronic fund transfers from a consumer's account may be authorized only by a writing signed or similarly authenticated by the consumer.  The person that obtains the authorization shall provide a copy to the consumer."  *See* 12 C.F.R. § 205.10(b).  According to the Federal Reserve Board's Official Staff Commentary, "[t]he authorization process should evidence the consumer's identity and assent to the authorization."  *Id.* at ¶ 10(b), cmt. 5.  The Official Staff Commentary further provides that "[a]n authorization is valid if it is readily identifiable as such and the terms of the preauthorized transfer are clear and readily understandable."  *Id.* at ¶ 10(b), cmt. 6.

VASA gets it right.  Barrientos gave VASA the green light, in writing, to charge his account on a monthly basis.  Barrientos also received a copy of that authorization.  The contract remained in effect because Barrientos never cancelled it.  So he has no claim.

The contract includes a provision that expressly gave authorization to VASA to make electronic transfers.  "Buyer has been informed and agrees that payments shall be made by electronic funds transfer."  *See* Membership Contract, "Promissory Note," at ¶ 7 (Dckt. No. 7-1, at 2 of 3).  And again:  "I agree and authorize my Bank to make payment to Paramount for and on behalf of VASA Fitness.  I agree that treatment of such payment shall be the same as if it were signed personally by me."  *Id.* at ¶ 6.

Barrientos does not dispute that the contract preauthorized VASA to charge his account to pay his monthly membership fee.  *Id.*  Instead, he alleges that he wasn't properly put on notice of the terms of the contract.

That position sits uncomfortably with the language of the agreement.  The contract itself shows that Barrientos consented to the monthly membership charges.  *See* Membership Contract (Dckt. No. 7-1, at 3 of 3).  "When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss."  *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

Here, the signed contract shows that Barrientos agreed to the monthly charges.  So, the contract satisfied the first statutory requirement that the customer must give written preauthorization.  If Barrientos decided not to read the contract before signing up, that was his choice – but that's on him.

VASA also provided Barrientos with a copy of the contract in its Welcome Email.  *See* Welcome Email (Dckt. No. 7-2, at 2 of 4).  The Welcome Email shows that it attached a pdf of

11

the contract. *Id.* (Dckt. No. 7-2, at 4 of 4). So, VASA also meets the second statutory requirement that a consumer must receive a copy of the preauthorization.

Barrientos cites a few cases, but they don't get him very far. One case did involve a gym membership and an EFTA claim arising from an unauthorized payment. *See Wendorf v. Landers*, 755 F. Supp. 2d 972, 976 (N.D. Ill. 2010). But in that case, plaintiffs did not challenge their preauthorized fund transfers for regularly recurring monthly gym membership fees. *Id.* Instead, they challenged a one-time fee that they did not agree to. *Id.* Judge Lefkow denied the motion to dismiss because plaintiffs sufficiently alleged that the "one-time charge was not covered by the terms of the plain contract," and so "the charge fell outside the scope of plaintiffs' preauthorization." *Id.* at 976–77; *see also O'Brien v. Landers*, 2011 WL 221865, at *2 (N.D. Ill. 2011) (same).

Here, the preauthorized electronic transfers fell within the scope of the written contract. Barrientos was charged his monthly membership fee provided in that agreement.

Barrientos also cites a smattering of out-of-district and out-of-circuit opinions. *See* Pl.'s Resp. Brf., at 13–14 (Dckt. No 24). Those decisions don't save the day. Those cases involve situations where the electronic funds transfer at issue fell outside the scope of the written contract, or where the consumer did not receive a copy of the authorization. *Id.*

Again, not so here. VASA obtained the necessary preauthorization to charge Barrientos. And it sent him a copy of the contract when he signed up for the membership in a Welcome Email. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 14 (Dckt. No. 18); *see also* Am. Cplt., at ¶ 26 (Dckt. No. 7).

Barrientos mostly hangs his hat on his attempt to cancel the contract. As Barrientos sees things, he cancelled the contract orally by talking to the local manager. After that point, any transfer of funds was unauthorized, because he revoked authorization by cancelling the contract.

Barrientos may have called the manager of the Villa Park location to cancel his membership. *See* Am. Cplt., at ¶¶ 60–61 (Dckt. No. 7). But the only way for Barrientos to stop the monthly charges was to cancel the contract. And the only way to cancel the contract was to do so in writing, with one month's notice. *See* Def.'s Reply Brf., at 14 (Dckt. No. 26); Membership Contract (Dckt. No. 7-1, at 3 of 3).

At bottom, Barrientos believes that he had a right to go his own way, do his own thing, and cancel the contract as he saw fit. But that wasn't the deal that he struck with the gym. The contract allowed Barrientos to terminate the contract only if he provided one month advance notice. He didn't. He didn't have a right to make his own set of rules.

Barrientos accepted a contract with barriers to exit. He is stuck with the contract that he accepted, like it or not.

True, the contract didn't make things easy for customers to get out of the contract. It wasn't exactly at the level of the Hotel California, where you can never leave. But it wasn't easy on members to cancel, either. Even so, the statute does not prohibit this sort of cancellation provision, so Barrientos is bound by the deal.

Barrientos never cancelled the contract in the way contemplated *by* the contract. Barrientos gave VASA the green light to transfer funds on day one, and that green light continued to shine because Barrientos never cancelled the contract the right way. VASA had a right to withdraw funds because Barrientos gave the gym that right.

In the end, Barrientos has no claim under the EFTA. The EFTA prohibits the transfer of funds without written preauthorization and notice to the customer. And here, Barrientos authorized the transfer of funds in writing before the transfers took place, and he received notice of that authorization. Count V is dismissed.[3]

## II.    State-Law Claims

Barrientos also brings four state-law claims. He alleges violations of three state statutes: the Illinois Automatic Contract Renewal Act (Count I), the Illinois Physical Fitness Services Act (Count III), and the Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV). He also brings an unjust enrichment claim in the alternative (Count II).

The Court will address the three statutory claims before turning to unjust enrichment.

### A.    Illinois Automatic Contract Renewal Act (Count I)

The first state-law claim involves the Illinois Automatic Contract Renewal Act (for anyone who craves acronyms, "IACRA"). *See* Am. Cplt., at ¶¶ 115–16 (Dckt. No. 7).

As the name suggest, the Illinois Automatic Contract Renewal Act protects consumers when it comes to contracts with automatic renewal provisions. For present purposes, the main point is that any provision about automatic renewal must be "clear[]" and "conspicuous[]." *See* 815 ILCS 601/10(a).

"Any person, firm, partnership, association, or corporation that sells or offers to sell any products or services to a consumer pursuant to a contract, where such contract automatically

---

[3] The EFTA does allow for a different way to stop preauthorized electronic transfers. *See* 15 U.S.C. § 1693e; 12 C.F.R. § 205.10(b). But to do so, the consumer must contact their bank and instruct them to stop payment. *See* 15 U.S.C. § 1693e(a) ("A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer."); *see also* 12 C.F.R. § 205.10(b)(c)(1) (same). And here, Barrientos did not contact his bank to instruct them to stop payment.

renews unless the consumer cancels the contract, shall:  (i) disclose the automatic renewal offer terms *clearly and conspicuously* in the contract . . . ."  *Id.* (emphasis added).

Until recently, the statutory text left the meaning of the phrase "clearly and conspicuously" up in the air.  *Id.*  But in 2024, the Illinois General Assembly amended the statute and added a definition.  Under the 2024 amendment, it isn't good enough for a contract to say that the contract automatically renews, even if the contractual language is crystal clear.

Instead, the 2024 amendment says that a contract must call attention to the automatic renewal provision, above and beyond the words themselves.  The amended statute basically requires the textual equivalent of a highlighter, or a spotlight, or a megaphone, or some other extra-contractual way to grab the consumer by the ear and get his or her attention.

The 2024 amendment provides:  "'[c]lear and conspicuous' means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language."  *See* 815 ILCS 601/5.

That language might be useful going forward, but it doesn't lend much help in the case at hand.  Barrientos filed suit in 2023, and the 2024 statute gives no indication that the new definition applies retroactively.  *See Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 620 (7th Cir. 2007) (quoting *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994)) (stating the "traditional presumption" that statutes do not apply retroactively absent clear congressional intent, and describing the imposition of "new duties with respect to transactions already completed" as a form of retroactivity); *Doe A. v. Diocese of Dallas*, 917 N.E.2d 475, 482 (Ill. 2009) (discussing the adoption of the *Landgraf* approach into Illinois law).

Putting aside the 2024 amendment, the essential claim remains the same. The gist of the claim is that the Illinois Automatic Contract Renewal Act required contracts to disclose automatic renewal provisions clearly and conspicuously. Barrientos believes that the contract in question falls short of that standard.

The parties work up a sweat debating whether the *website* called attention to the existence of the contract. VASA points out that the webpage included a hyperlink to the contract. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 7 (Dckt. No. 18). The consumer simply had to click on the link saying "VIEW FULL CONTRACT." *See* Am. Cplt., at ¶¶ 19, 22–23 (Dckt. No. 7).

That link wasn't exactly hidden, either. That phrase appeared in all caps. It was underlined. And it appeared in bright-shining blood red. If you wanted to pick a color that would say "stop, pay attention, and look here," red would be it.

So, VASA thinks that Barrientos has no claim because the webpage expressly pointed the consumer to the agreement. The language of the contract was only a short click away. And the contract included the provision about automatic renewals.

On the flipside, Barrientos responds that the webpage itself does not call attention to the fact that the contract renewed automatically. *See* Pl.'s Resp. Brf., at 3 (Dckt. No. 24). In his view, "the scrollable list does not contain any disclosures regarding the automatic renewal of the contract, and therefore does not comply with the IACRA." *Id.* As Barrientos sees things, it isn't good enough that the contract covered automatic renewals, because the webpage itself did not highlight the automatic renewals.

The parties are barking up the wrong tree by focusing on the webpage. The statute says that the disclosure about automatic renewals must appear "clearly and conspicuously *in the*

16

*contract*." *See* 815 ILCS 601/10(a) (emphasis added). The statute focuses on the contract itself. The webpage is neither here nor there. The contract is what matters.

Here, the contract says in plain English that the contract will renew automatically. "Following the initial 1 (one) month membership term, my/our membership agreement will automatically renew on a month-to-month basis at the monthly rate of $12.49 until a written 1 (one) month cancellation notice is received by VASA Fitness at the address noted below." *See* Membership Contract, "Promissory Note," at ¶ 2 (Dckt. No. 7-1, at 2 of 3).

Based on the words themselves, the disclosure seems clear. The phrase "will automatically renew on a month-to-month basis" doesn't leave a lot of room for confusion or uncertainty. *Id.* Frankly, it hard to think how the language could be clearer.

Still, the statute also says that the disclosure must be "conspicuous[]." *See* 815 ILCS 601/10(a). The contract at hand includes a clear disclosure, but it doesn't do anything to call special attention to it, either. The text is not bolded, or underlined. The text has no color. The text does not use all caps. The font size is the same as other provisions, too.

If anything, the language is *less* conspicuous than other provisions of the contract. Other provisions did use bolded text. Other language appeared in all caps. Other text appeared in larger font. And other provisions required an express acknowledgement by the consumer, with his initials and the date.

By comparison, the automatic renewal provision did not call attention to itself. The contract itself did not do anything to make the automatic renewal provision more conspicuous. It's there, and it's not hidden. But it's not on center stage with a spotlight, either.

True, Barrientos's initials appeared after the automatic contract renewal language. But VASA auto-generated Barrientos's initials at checkout, so the initials add nothing to the conspicuousness of the language. *See* Am. Cplt., at ¶ 21 (Dckt. No. 7).

A plaintiff doesn't have the world's heaviest lift at the motion-to-dismiss stage. A complaint simply needs to satisfy the requirements of notice pleading, as explained in *Twombly* and *Iqbal*. For now, the complaint at hand does enough to allege a claim that the contractual language was not sufficiently "conspicuous[]" within the meaning of the Illinois Automatic Contract Renewal Act.

VASA goes on a bit of detour by arguing that the contract in question is a so-called "clickwrap agreement." *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 7 (Dckt. No. 18). That's a different issue.

The question is not whether the parties formed a contract. And the question is not whether Barrientos agreed to the terms of the contract as stated in full in the contract on the webpage. The existence of the contract is not the point.

The question is whether the terms of the contract were sufficiently clear and conspicuous to satisfy the statutory requirements for this type of contract. And here, the complaint does enough to state a claim.

The motion to dismiss the claim under the Illinois Automatic Contract Renewal Act (Count I) is hereby denied.

### B. Illinois Physical Fitness Services Act (Count III)

Next, Barrientos brings a claim under the Illinois Physical Fitness Services Act (for any reader who wants another helping of acronyms, "IPFSA").

18

The statute prohibits "[u]nfair or deceptive acts and practices" by fitness centers. *See* 815 ILCS 645/10(a). The statute gives a laundry list of examples, including coercive sales tactics and misrepresentations about the gym. *Id.* A contract is "void and unenforceable" if the customer entered into the agreement based on false, fraudulent, or misleading information. *See* 815 ILCS 645/10(b).

The statute also requires contracts to have a special provision about planned gyms that are under construction and have not yet opened their doors. The basic idea is that the contract must give the customer a right to cancel.

"Every contract for physical fitness services at a planned physical fitness center or a center under construction shall further provide that, in the event that the facilities and services contracted for are not available within 12 months from the date the contract is entered into, or within 3 months of a date specified in the contract, whichever is earlier, the contract may be cancelled at the option of the customer, and all payments refunded within 30 days of receipt by the center of the cancellation notice." *See* 815 ILCS 645/7.

Barrientos claims that VASA violated the statute a few different ways. First, the complaint alleges that the contract is unfair and deceptive, largely because of a lack of notice about the terms of the contract. He alleges that VASA failed to "present[] the contract" to the members. *See* Am. Cplt., at ¶ 74(b)–(e) (Dckt. No. 7). And more specifically, Barrientos alleges that VASA failed to disclose that it would continue to charge monthly fees "after he cancelled his membership." *Id.* at ¶ 74(a). Second, Barrientos faults the company for failing to include a contractual provision about gyms that were under construction. *Id.* at ¶¶ 76–77.

At the outset, there isn't much room to doubt that the statute applies to the contract in question. The IPFSA covers a contract with a "[p]hysical fitness center" for "physical fitness

services." *See* 815 ILCS 645/2(a). Physical fitness services include "instruction, training or assistance in physical culture, bodybuilding, exercising, weight reducing, figure development, judo, karate, self-defense training, or any similar activity; use of the facilities of a physical fitness center for any of the above activities; or membership in any group formed by a physical fitness center for any of the above purposes." *See* 815 ILCS 645/2(b).

VASA drops a footnote suggesting that the statute does not apply. But good arguments don't tend to live in footnotes. That's why they're in footnotes.[4]

Barrientos has no claim about a lack of notice. Barrientos believes that the company misrepresented that it would continue to charge him after cancellation. *See* Am. Cplt., at ¶ 74(a) (Dckt. No. 7). That claim goes nowhere because Barrientos failed to cancel in writing as required by the contract.

Also, Barrientos had an opportunity to view the complete contract before signing up. *Id.* at ¶ 74(b)–(e). Before checking the box that said "ACCEPT TERMS & APPLICATION FEES," Barrientos could have clicked the link to "VIEW FULL CONTRACT." *Id.* at ¶ 22.

The only remaining piece of the claim is the allegation about gyms that are under construction. The argument is straightforward. The statute requires contracts to have a provision about a right to cancel when the gym isn't yet ready for use. *See* 815 ILCS 645/7. Here, the contract in question did not include that provision. So, as Barrientos sees things, the contract violated the statute. Mandatory language was missing.

---

[4] VASA suggests that Barrientos's "challenge to [its] billing practices does not fall within the scope of the IPFSA." *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 11 n.3 (Dckt. No. 18). As the company sees it, billing practices are not "services" under the IPFSA. That's neither here nor there. When it comes to the applicability of the statute, the nature of the contract is what matters. The IPFSA covers contracts "for physical fitness services." *See* 815 ILCS 645/10(b). That's the type of contract at issue here. The contract in question governed the relationship, including billing practices. So Barrientos can bring a claim about the billing practices under the contract.

The case does involve a gym that was not yet ready. Barrientos signed up for a membership at a particular gym in Villa Park, Illinois when it was under construction. *See* Am. Cplt., at ¶ 56 (Dckt. No. 7); Membership Contract (Dckt. No. 7-1, at 2 of 3). The membership began on the "DAY CLUB OPENS," and would renew "30 DAYS FROM OPENING." *Id.* Barrientos signed the contract on October 7, 2021. *Id.* The gym opened two months later, in December 2021. *See* Am. Cplt., at ¶¶ 58–59.

VASA devotes most of its energy to a challenge to standing. As the company sees things, Barrientos suffered no harm. The failure to include the mandatory provision made no difference.

VASA points out that the complaint fails to allege that it charged him a membership fee before the gym was ready to use. *See* Def.'s Mem. in Support of Mtn. to Dismiss, at 9–10 (Dckt. No. 18). Also, Barrientos never alleges that including the mandatory language about the right to cancel would have dissuaded him from entering into the contract. *Id.* at 10.

The existence of an injury is an essential element of a claim, and is an essential piece for jurisdiction, too. The statute authorizes a claim by a "customer injured by" a violation of the statute. *See* 815 ILCS 645/11. The text requires an injury, so the lack of an injury means that a plaintiff has no claim. *See Mullen v. GLV, Inc.*, 37 F.4th 1326, 1330 (7th Cir. 2022); *see also Casillas v. Madison Ave. Assoc., Inc.*, 926 F.3d 329, 331–32 (7th Cir. 2019) (Barrett, J.).

The complaint fails to allege that Barrientos suffered an injury. It isn't enough to allege that the contract failed to include mandatory language. The complaint must allege that the failure to include that language caused Barrientos to suffer harm. And that's where the claim falls short.

Barrientos does not allege that the lack of disclosure caused him a real-world injury. Barrientos does not allege that the company billed him when he couldn't use the gym. So, the complaint does not allege a monetary harm from the lack of disclosure.

Barrientos also does not allege that he would have acted differently if the contract had included the provision in question. That is, he does not allege that he would have taken a pass on the gym membership if he had known about the right to cancel.

If anything, any such allegation would seem upside down. The provision in question would have given him more rights to cancel, not less. It is hard to see how a provision giving a customer *more* rights to cancel could have persuaded the customer not to accept the contract in the first place.

If anything, the complaint dooms any argument about a right to cancel. The gist of the claim is that the contract did not inform Barrientos about his right to cancel if the gym didn't open for business within a certain time frame.

But Barrientos decided to cancel the contract anyway. And he didn't do it the right way. He called the manager, and purported to cancel the contract orally. But the contract required written cancellation, one month in advance.

It is hard to see how Barrientos could have suffered an injury from the lack of a provision about his right to cancel. Barrientos purported to exercise his right to cancel anyway. And he didn't do it the right way.

The lack of disclosure didn't cause him harm because he didn't follow the rules of the contract for how to cancel. Telling Barrientos that he had a contractual right to exit the contract wouldn't have made a difference. Barrientos didn't use the key that the contract gave him. He

tried to barrel out of the contract by going his own way and blowing through the doors. But that's not the way out.

Simply put, a failure to inform Barrientos about the right to cancel did not cause him an injury. He tried to cancel anyway. And when he *did* try to cancel, he didn't do it the right way.

For those reasons, the claim under the Illinois Physical Fitness Services Act (Count III) is dismissed.

### C. Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV)

The next claim involves the Illinois Consumer Fraud and Deceptive Business Practices Act (for anyone who hasn't yet had their fill of acronyms, "ICFA"). Like the Illinois Physical Fitness Services Act, the ICFA prohibits "unfair or deceptive acts or practices." *See* 815 ILCS 505/2.

The claim is more of the same. Once again, Barrientos alleges that VASA violated the statute by charging its customers monthly membership fees even after they cancel. *See* Am. Cplt., at ¶ 148 (Dckt. No. 7). And he claims that the company failed to disclose its "policy and practice of charging fees after cancelation." *Id.*

Again, Barrientos has no claim about cancelation. Barrientos purported to cancel the contract orally by talking to a local manager. But the contract required written notice, one month before cancellation. Barrientos did not cancel the contract as contemplated by the contract, so he has no claim about the continuing fees.

Barrientos also has no claim about the failure to disclose. The website included a link to the full term of the contract. Also, the simple reality is that Barrientos did not cancel the contract at all, so he has no claim about "failing to disclose its policy and practice of charging fees after cancelation." *Id.*

The claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV) is dismissed.

### D.    Unjust Enrichment (Count II)

The fifth and final claim is unjust enrichment.  Barrientos seeks the disgorgement of "[a]ll improperly assessed fees."  *See* Am. Cplt., at ¶ 123 (Dckt. No. 7).  The idea is that VASA cannot keep his fees if the contract is null and void.

"Unjust enrichment is a 'quasi-contract' theory that permits courts to imply the existence of a contract where none exists in order to prevent unjust results."  *Prudential Ins. Co. of Am. v. Clark Consulting, Inc.*, 548 F. Supp. 2d 619, 622 (N.D. Ill. 2008).  "Unjust enrichment is a common-law theory of recovery or restitution that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust.  What makes the retention of the benefit unjust is often due to some improper conduct by the defendant.  And usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute."  *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).

Unjust enrichment does not stand on its own.  Instead, unjust enrichment stands on the shoulders of some other claim.  "So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim – and, of course, unjust enrichment will stand or fall with the related claim."  *Id.*  They rise or fall together.

"Under Illinois law, unjust enrichment is not a separate cause of action.  Rather, it's a condition brought about by fraud or other unlawful conduct."  *See Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739–40 (7th Cir. 2019) (cleaned up); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011); *Ass'n Benefit*

24

*Servs. v. Caremark Rx, Inc.,* 493 F.3d 841, 855 (7th Cir. 2007) ("[W]here the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well."); *see also Flores v. Aon Corp.*, 2023 WL 6333957, at *7 (Ill. App. Ct. 2023) ("Unjust enrichment is not an independent cause of action. 'Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress or undue influence, and may be redressed by a cause of action based upon that improper conduct.'").

Unjust enrichment does not come into play when the language of a contract already covers the conduct in question. "When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract." *Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004). "The reason for prohibiting a claim of unjust enrichment between contracting parties is to prohibit a party whose expectations were not realized under the contract from nevertheless recovering outside the contract." *Id.* at 689; *see also Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 887 (7th Cir. 2022) ("An unjust enrichment claim may survive a motion to dismiss when the validity or the scope of the contract is difficult to determine, or if the claim at issue falls outside the contract.").

Here, Barrientos brings an unjust enrichment claim to recover the membership fees if the contract is deemed null and void. "This claim is brought solely in the alternative to Plaintiff's statutory claims and applies only if the parties' contract is deemed unconscionable, null and void, or otherwise unenforceable for any reason." *See* Am. Cplt., at ¶ 123 (Dckt. No. 7); *see also id.* ("Also, if claims are deemed not to be covered by the contract – for example, if Defendant has

violated state and federal law, but in such a way that it does not violate the contract, then unjust enrichment will require disgorgement of all improperly assessed subscription fees.").

Barrientos has challenged the validity of the contract under only one statute, the Illinois Physical Fitness Services Act. *Id.* at ¶ 80 (seeking a declaration that the contract is void under the IPFSA); *id.* at ¶ 82 (same); *id.* at ¶ 137 (same); *id.* at ¶ 142 (same); *see also* 815 ILCS 645/10(b) (providing that "[a]ny contract for physical fitness services entered into in reliance upon any false, fraudulent, or misleading information, representation, notice or advertisement . . . shall be void and unenforceable"). Barrientos is not challenging the validity of the contract under any other statute.

The complaint fails to state a claim under the Illinois Physical Fitness Services Act, so there is no basis to void the contract under that statute. The complaint does not seek to invalidate the contract under the only surviving claim, meaning the count under the Illinois Automatic Contract Renewal Act. *Id.* at ¶¶ 111–21. Instead, the complaint seeks damages. *Id.* at ¶ 121.

Unjust enrichment comes into play if the contract in question is void. But Barrientos is not seeking to invalidate the contract under the sole remaining claim, meaning the claim under Illinois Automatic Contract Renewal Act. So there is no basis for a request for unjust enrichment, either.

In his brief, Barrientos tries to defend the unjust enrichment claim by invoking the now-familiar theory that he lacked notice of the terms of the contract. *See* Pl.'s Resp. Brf., at 7 (Dckt. No. 24). Those allegations fail to state a claim, for the reasons explained above.

The unjust enrichment claim (Count II) is hereby dismissed.

**Conclusion**

For the foregoing reasons, Defendant's motion to dismiss is hereby granted in part and denied in part. The Court grants the motion to dismiss the federal claim under the Electronic Funds Transfer Act (Count V). The Court grants the motion to dismiss the state-law claims under the Illinois Physical Fitness Services Act (Count III) and the Illinois Consumer Fraud and Deceptive Business Practices Act (Count IV). The Court grants the motion to dismiss the unjust enrichment claim (Count II). The Court denies the motion to dismiss the claim under the Illinois Automatic Contract Renewal Act (Count I).

Date: September 18, 2024

Steven C. Seeger
United States District Judge